[Civ. No. 2986. Fourth Dist. Jan. 8, 1943.]

E. JOHN ERIKSSON et al., Plaintiffs and Appellants, v. WILLIAM D. WISE, Respondent; B. W. BELYEA et al., Cross-Defendants and Appellants.

E. John Eriksson, in pro. per., and Martin C. Colvin for Appellants.

Charles G. Potter and Harry H. Parsons for Respondent.

GRIFFIN, J.— Appellants instituted this quiet title action against respondent, alleging that they were the owners of three quartz mining claims, known as the Antimony No. 1, Antimony No. 2, and Black Eagle Antimony, all situated in the Wild Rose Mining District in Inyo County, and that respondent, without right, claims an interest therein adverse to them. Respondent answered, denied generally the allegations of the complaint, and by way of cross-complaint he, after setting out certain claimed rights by virtue of a partnership agreement, leases, and contracts which were contended to be irreconcilable with appellants' claimed interest, sought a declaratory judgment under section 1060, et seq. of the Code of Civil Procedure, declaring respondent to be the owner of an undivided one-half interest in Antimony No. 1, a one-fourth interest in Antimony No. 2, and an undivided one-half interest in Black Eagle Antimony, and that respondent and Belyea are the owners of an identical interest in said claims and that appellant Eriksson owns an undivided one-half interest only in Antimony No. 2.

On the 10th day of May, 1939, one Brock was the owner of the unpatented mining claims above mentioned, with this exception, that appellant Eriksson was the owner of a one-half interest in the Antimony No. 2 claim. On that date Brock and Eriksson, as owners, entered into an agreement in writing with respondent Wise, wherein they, as owners, agreed to sell to Wise, and Wise agreed to purchase the mining claims above-mentioned for the sum of $32,500, payable $250 upon the execution of the agreement and the balance upon a royalty basis at the rate of ten per cent of the proceeds realized from the sale of the mineral content, the royalty payments being guaranteed to be not less than the sum of $150 each month. Wise entered into possession of the claims and on November 29, 1939, he entered into an agreement in writing with appellant Belyea, whereby Belyea agreed to furnish certain mining equipment for exploration purposes and also agreed to furnish the supplies and payroll for one month providing the payroll could not be raised from other sources. As a consideration for furnishing the equipment and supplies, Wise agreed that Belyea was to receive 50 per cent interest in the mining claims. Belyea furnished the equipment and supplies and payroll as agreed, and on January 2, 1940, Belyea and Wise entered into another contract in writing wherein it was recited that Belyea

had furnished the use of certain equipment, materials, labor, money and services for the development and exploration of the mining claims and further agreed to furnish certain other equipment and one 25-ton smelter when required, and wherein it was agreed that Belyea was the owner of a two-thirds interest in and to the "mining claims and stock in the corporation, when organized, will be issued on this basis." The parties agreed to incorporate and issue stock on the basis of two-thirds to Belyea and one-third to Wise, and thereafter to operate as a corporation. The evidence indicates that Wise ceased working on the property in the spring of 1940, but made a few trips to it thereafter. Belyea continued the exploration and development work until about April 15, 1940, when he withdrew all active work of development or exploration thereon. Belyea did not furnish any extra equipment as provided in the agreement of January 2, 1940. He decided it was not needed upon the showing made. Belyea testified that he expended in excess of $25,000 on the project. Wise testified that he had contracted several items of indebtedness on the claims before executing his agreement with Belyea, and that Belyea agreed to pay these obligations. The corporation to be organized never proceeded beyond the initial stages of filing the articles of incorporation. No royalty payments were ever made to Brock and Eriksson other than the guaranteed payments of $150 each month. The guaranteed payment of $150 which was due and payable on or before the 10th day of April, 1940, was not paid until the 7th day of May, 1940. Appellants claim that the payment due on May 10, 1940, was never paid. Respondent disputes this claim and contends that Belyea made this payment for the partnership. Operation and development of the premises had then ceased. More than 30 days expired after the payment of the $150 then claimed to be due and payable to Brock and Eriksson, and the owners immediately endeavored to terminate all of Wise's interest in and to the mining claims and premises. Immediately after Wise was notified of such claimed termination Brock, without further notice to Wise, sold all of his right, title and interest in the mining claims to Belyea at a greatly reduced price. Belyea and Eriksson were at all times since that date the record owners of the mining claims. This action followed.

The trial court found in favor of respondent Wise on his

cross-complaint and against the appellants on their complaint and concluded that a mining partnership existed between Wise and Belyea; that Belyea was liable for all debts of Wise arising from the operation of the mining premises; that neither party was entitled to an accounting from the other; and that Belyea should transfer to Wise the undivided one-half interest owned by Belyea in and to the mining claims. It also was found by the court that the contract between Brock and Eriksson, as sellers, and Wise, as buyer, was a lease with an option to purchase, and found that all of the terms and conditions thereof had been complied with by Belyea and Wise, as copartners, at the time of the attempted termination; that Belyea falsely purported to be in default in the payments due under the lease in May, 1940, and wrongfully and purposely permitted and caused pretended defaults to be made in the option and lease; that thereafter he secretly and clandestinely, with the object and design of cheating and defrauding his copartner Wise, purchased the interests and title of the predecessor of the parties, save the interest of Eriksson, took paper and record title thereto in his own name, in breach of his contract, and in violation of the trust and fiduciary relationship that existed between them; that there was an actual controversy existing between them; and that there is no controversy concerning the undivided one-half interest of Eriksson in Antimony No. 2, which is his, free from claims of either of the copartners or the copartnership.

The court then rendered judgment as follows: That Belyea and Wise are mining copartners; that neither is entitled to an accounting from the other and that each is the owner, as such copartner, of an undivided one-half interest in Antimony No. 1 and Black Eagle Antimony mining claims, and each is the owner of a one-fourth interest in Antimony No. 2 mining claim, subject to the paramount title of the government of the United States; that the copartnership interest of Belyea in the mining claims is alone liable for any and all outstanding debts and obligations incurred by Belyea and for the obligations of Wise arising from the operation of the mining claims existing at the time of the formation of the partnership which Belyea assumed and agreed to pay; that Belyea forthwith execute and deliver to Wise a good and sufficient deed to a one-half interest in Antimony No. 1 and Black Eagle Antimony mining claims and to an undivided

one-fourth interest in Antimony No. 2 mining claim; and that each of the parties pay their or his own costs.

It is argued first that the evidence does not support the finding that a copartnership existed between Belyea and Wise. Respondent contends that the two written agreements signed by Belyea and Wise and the oral testimony given at the trial in reference to the conduct of the parties fully supports the finding of the trial court in this respect. The evidence shows that prior to the time Wise interested Belyea in his mining property he had erected some cabins upon it, built roads, developed the property to some limited extent, and then made a written agreement with Belyea under which Wise was to furnish the locations and Belyea was to put in men, material and equipment for the development of the claims, for which he was to get a 50 per cent interest in Wise's lease and option. On November 30, 1939, Belyea wrote to Wise stating in part as follows:

"Please notify me at once if you are in arrears on any of the royalty payments. If this is the case we must make arrangements with the principals at once before any work is done so that there will be no foreclosure.

"Further, I think it would be extremely advisable at this time to stake the adjacent claims before we start any road work and if, after making the necessary checks at Inyo, you find that these claims are open or can be jumped without too much risk, we would have them located in the name of one or more of my trusted employees if for any reason you do not care to stake them in your own name.

"I have this in mind, that once we start the road work we will put up several pieces of equipment and complete it in a very short time which will naturally throw that country open to vehicular traffic and there will be every attempt made to stake claims surrounding our operation."

Belyea had been over the property on several occasions, sampled and tested it. Wise worked it until the spring of 1940. He testified that all moneys paid by Belyea were expended on the property. Under the first written agreement Belyea obligated himself (1) to furnish to Wise certain equipment for exploration purposes and that when the exploration work was completed a valuation would be put on the equipment and it would be purchased by the venture or returned to Belyea; (2) to furnish the payroll for the necessary number of workmen for one month as might be agreed upon by

Wise and Belyea; (3) that any properties located adjacent or reasonably adjacent to their claims should become a part of the transaction; (4) that for furnishing the equipment Belyea was to receive a 50 per cent interest in all claims; and (5) that the cost of acquiring such claims was to be stood jointly out of the production from such claims or by some mutually agreed arrangement that might be arrived at at some future date.

On January 2, 1940, another agreement was signed wherein Belyea agreed (1) to furnish more equipment, including a 25-ton smelter, when required in the operation of the mine; (2) that all business of the mine would be conducted as a corporation; and (3) that Belyea was "the owner of a two-thirds (66⅔%) interest in the said mining claims" and Wise was the "owner of a one-third (33⅓%) interest in the said mining claims, and stock in the corporation, when organized, will be issued upon this basis."

The record discloses that Belyea never furnished the 25-ton smelter because he determined that the mining of the ore would not pay; that the corporation papers were filed but stock was never issued to any of the parties and they did not function as a corporation. There is also evidence that Belyea originally agreed to pay to Wise for the benefit of the original venture the sum of $5,000 as consideration for an assignment from Wise to Belyea of rights in and to all ore, metals and materials extracted or to be extracted from the above-described claims. On February 28, 1940, Wise wrote Belyea to the effect that he was cancelling this assignment dated November 29, 1939, for the reason that "I received no consideration for said assignment, and that the purpose for which said assignment was given to you, namely, to raise $5,000 for our partnership affairs, has not been accomplished by you." On March 1, 1940, Belyea replied and stated in part:

"In your last paragraph the reason for such cancellation is not raising $5,000 for partnership affairs. The letter of cancellation is quite acceptable. The $5,000 was not raised for the reason that the party of interest in this matter, after making a survey of the property, decided there was not enough showing to put this amount of money in and that I proceeded at that time and put in the roads, camps and considerable exploration work . . . and at present all bills covering this are paid.

"The cost of such work from January 1, 1940, to March 1, 1940, will be accumulated immediately and you will be billed for your portion as per our agreement.

"Further we have made payments to Eriksson and Brock for the months of December, January and February and will pay them in the next few days for the month of March which amounts to $600."

It therefore appears that Belyea never advanced the $5,000 in cash as agreed upon. It may have been that Wise depended upon this sum of money to make the monthly payments on the purchase agreement. It further appears that Belyea had assumed the obligation of making those payments on behalf of the enterprise, whatever its legal status or descriptive appellation may have been. There was sufficient oral, as well as documentary, evidence which supports the trial court's finding that Belyea and Wise were engaged in such an enterprise as would constitute a mining partnership. (§ 2351 et seq., Pub. Resources Code; *Treat* v. *Murdock,* 8 Cal.2d 316 [65 P.2d 881]; *Del Giorgio* v. *Powers,* 27 Cal.App. 2d 668 [81 P.2d 1006]; *Moritz* v. *Lavelle,* 77 Cal. 10 [18 P. 803, 11 Am.St.Rep. 229]; *Harper* v. *Sloan,* 177 Cal. 174 [169 P. 1043, 181 P. 775]; *Sturm* v. *Ulrich,* 10 F.2d 9.) █ After the creation of the partnership, the mere fact that the parties might later have contemplated organizing a corporation and issuing stock did not prevent the parties from remaining partners in the interim. (*Bell* v. *Wright,* 25 Ariz. 97 [213 P. 575]; 40 C.J., § 798, p. 1146.) Therefore, if Belyea and Wise were partners, their incomplete agreement to form a corporation later in no wise affected that relationship. Their undertaking so to form the corporation never ripened into actuality. Had they succeeded, the partnership no doubt would have been merged in the corporation and expired. However, Belyea refused to go through with that. Instead, the court found and the evidence supports the finding that he intrigued to "buy in" and oust Wise of all interest in or connection with the mining lease. █ We need cite no authority to support the rule that where a partnership is shown to exist and where one partner is trusted with the rights of his co-adventurer, it imposes upon him the duty of caring for the other's rights equally with his own. Neither will be allowed to obtain by secret agreement any advantage over the other. (*Menefee* v. *Oxnam,* 42 Cal.App. 81 [183 P. 379]; *Stenian* v. *Tashjian,* 178 Cal. 623 [174 P. 883]; *King* v. *Wise,* 43

582

Cal. 628; *Trice* v. *Comstock*, 121 F. 620 [57 C.C.A. 646, 61 L.R.A. 176]; *Clark* v. *Mitchell*, 35 Nev. 464 [130 P. 764, 134 P. 449]; *Flagg* v. *Mann*, 2 Sumn. 486, Fed.Cas. No. 4847 [Opinion by Story].)

 Although the evidence is conflicting, there is some evidence that the May payment under the purchase agreement (past due on June 10 on account of a 30-day grace period) had been paid by Belyea before the sellers were entitled to default Wise under his contract. The evidence in this respect was quite confusing as displayed by the record. Belyea testified that he made all of the payments under the contract during the time "he was interested in operations out there," i. e., "we paid the rental up to and including the month of April." Brock testified that he met Wise before the payment due on June 10 was made; that in a conversation a Mr. Potter asked him if he was "going to default for the nonpayment of the June 10 royalty"; that he told Wise that he had to have his payment or he would default the contract. On cross-examination Brock testified as follows: "Q. I will ask you if in a letter a few days later to Mr. Wise or Mrs. Wise you said that Belyea had made the June payment? A. I probably did." He then testified: "Q. Do you recall if you told Mr. Wise whether the June, 1940, payment had been paid? A. I believe I did. Q. That June payment had not been made had it? A. The May payment was made on the 10th of June. I never told him the June payment was made to. . . . Q. When you just testified you confused dates, didn't you? . . . A. I didn't tell them that I received any June payment and the June payment has never been made . . . Q. The May payment has not been made either, has it? A. No. . . . When you stopped by there what payment was due? A. The May payment had been made. That carried it up to June 10, the June payment was due on the 10th of June . . . They hadn't made the May 10 payment? A. It was made the 7th day of June." On or shortly prior to June 10 Brock made a deal with Belyea for the sale of the mines to him. Belyea, not Brock, then gave Wise notice of his claimed forfeiture of the contract between Wise and Brock. The finding of the trial court that the contract was not in default at that time cannot be disturbed by this court on appeal.

 It is next argued that the evidence conclusively shows that Wise abandoned his contract of purchase, and was not

entitled to rely upon it in support of his claimed rights under it, and that he did not diligently operate the mining premises and that he abandoned them, which would entitle appellants to declare a forfeiture for that reason. The record indicates that the claimed forfeiture was not based on any of the above-mentioned grounds, but solely upon the failure to make the payments under the contract. The case was tried upon that theory. These last grounds mentioned were not the issues at the trial. We cannot therefore consider them for the first time on appeal. Notwithstanding this conclusion, since the trial court found that a partnership existed between Belyea and Wise, it must therefore follow that any work done by Belyea on the claim was the work of Wise also. Brock and Eriksson consented to the assignment by Wise of any of his interest in the claims to Belyea. ▮ The trial court found upon conflicting evidence that Belyea wrongfully and without cause excluded Wise from any participation in the management or operation of the mining claims. Respondent Belyea cannot now take advantage of any claimed forfeiture for failure of Wise, his copartner, to diligently operate the mine. The evidence supports the court's implied finding that there was no abandonment by Wise. Under the judgment, Eriksson still retains all the interest he ever had in the property so he cannot be prejudiced.

▮ The argument that Wise cannot obtain a recovery under the evidence because he failed to do equity in not also furnishing funds, labor and materials to make the exploratory venture a success is not meritorious, in view of the agreements between the parties and the evidence supporting the trial court's findings. There is evidence that Wise's interest in the claims assigned to Belyea had a much larger potential value than the price agreed to be paid by Wise. He testified that he had expended about $3,500 under the contract before Belyea acquired his interest. He also testified that he had expended his own time, gasoline and oil on the claims in addition to many other items; that Belyea, as part of the consideration for the assignment of interest, agreed to pay outstanding obligations owed by Wise for services performed on the mining property. It must be remembered that this action was strictly an equitable proceeding. The trial court endeavored to balance the equities of all parties concerned. We cannot say as a matter of law that the trial court abused its discretion in this respect.

The other points raised on the appeal are not deserving of further consideration.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.